IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 14, 2009 Session

## STATE OF TENNESSEE v. JAMES NELSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-05821     James C. Beasley, Jr., Judge**

---

**No. W2008-01886-CCA-R3-CD  - Filed December 23, 2009**

---

The defendant, James Nelson, was convicted of reckless endangerment with a deadly weapon, a Class E felony, as a lesser included offense of the indicted offense of aggravated assault. He was sentenced, as a Range III, persistent offender, to six years in confinement. On appeal, he contends that the evidence was insufficient to sustain his conviction and that he was sentenced improperly. After careful review, we affirm the judgment from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Robert Wilson Jones, District Public Defender, and Phyllis Aluko and Russell White, Assistant Public Defenders, for the appellant, James Nelson.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and Theresa McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The victim in this case was shot in both eyes following an altercation inside a boarding house. The victim and the defendant were acquaintances prior to the shooting.

The victim testified at trial that the defendant came to the boarding house approximately every other day. He recalled that on October 21, 2006, the defendant walked up to him and pushed him. The defendant then brandished a gun and pointed it at his head. The victim testified that he "ducked a little bit" and that everything went black. He felt his body go numb, and he went into shock. He heard someone screaming, "he going to kill him, he going to kill him." He felt like he had water running down his face and "two holes in [his] eyeball." He fell to his knees and thought he hit the ground. He said that the defendant was the last person he saw.

The victim was taken to the hospital where he had emergency surgery on both eyes. One of his eyes was removed, and the other was sewn up. He lost vision in both eyes as a result of the shooting.

He acknowledged that he did not remember everything from the day of the shooting, but he maintained that the defendant started the altercation, pushed him, and aimed a gun at his head. The victim testified that he had never owned a gun and that he was unarmed on the day of the shooting.

He testified that his girlfriend was at the boarding house on the day of the shooting. He was not aware that she witnessed the shooting but remembered hearing her scream afterward. The victim said that his girlfriend did not have a knife in her hand and did not confront the defendant.

The victim's girlfriend, Earsha Humphrey, testified that she dated the victim at the time of the shooting. She occasionally saw the defendant at the boarding house where the victim lived. She testified that she purchased drugs from the defendant on the evening prior to the shooting and that they had an altercation because he did not give her change. She recalled that on the afternoon of the shooting, she was on the front porch of the boarding house with the victim and the resident manager. She had a black eye, and the victim asked her why she had a black eye. She responded that she had been in a fight with the defendant. Shortly thereafter, the defendant arrived at the house. The victim asked the defendant why he hit his girlfriend, and the defendant acknowledged that he struck her.

Humphrey testified that the defendant went inside the house and that the victim followed him. She said that she tried to keep the victim away from the defendant and that she heard what she thought was a gunshot. The victim began to run, and the defendant ran after him. She followed the men outside and saw the victim on his knees, bleeding. The defendant was standing over the victim holding a gun to the victim's head. She heard the defendant say, "I ought to finish your ass," before he ran away. She helped the victim into the house and then called for an ambulance. She testified that the victim did not have a gun and that she had not seen the victim with a gun in the three years that they dated. She later identified the defendant from a photographic lineup as the shooter.

Lonnie Holmes, the resident manager of the boarding house, testified that the victim lived in the house for a few months prior to the shooting. He stated that the defendant did not live at the house but visited for the purpose of selling drugs in the kitchen. He allowed the defendant to sell drugs in the house in exchange for drugs. He testified that he was awakened by a gunshot on the day of the shooting. He saw blood in the hallway leading from the front door to the kitchen. He recalled seeing the victim's girlfriend help him into the house from outside, but the defendant was not at the house. He also testified that he had never seen the victim with a gun.

Officer Deadrick Brittman of the Memphis Police Department testified that he was the first to respond to the shooting call at the boarding house on October 21, 2006. He stated that the victim's girlfriend led him inside the house and down a long hallway to the kitchen where the victim was located. He recalled that the victim was holding a shirt to his face and that there was a lot of

blood. He advised dispatch to send paramedics and a supervisor. He made a cursory search of the victim and the girlfriend but did not find a gun.

The defendant testified that he previously sold cocaine. He said that, for approximately five or six years, he sold drugs in the kitchen of the boarding house every day or every other day. The defendant acknowledged that he occasionally gave drugs to the resident manager in exchange for allowing him to sell drugs in the kitchen.

The defendant testified that as he was walking into the boarding house he was approached on the front porch by Humphrey, who claimed the drugs he sold her the previous night were no good. He stated that Humphrey spit in his face and said she wanted her money back. The defendant testified that he pushed her off the porch steps in response. He said that he went into the house and gave the manager some cocaine before going into the kitchen. He said he left after about three hours to get something to eat. He returned to the boarding house, plugged in a cellular phone to charge in the kitchen, and left again.

After he returned, the defendant said that he was getting his phone from the kitchen when the victim and Humphrey entered the kitchen. He said that the victim raised a revolver and threatened him while moving toward him. The defendant testified that he grabbed the victim's wrist, put his arm around the victim's neck, and pushed him toward the wall. The defendant maintained that he never touched the gun. He said the gun fired between their faces when they hit the wall. He claimed that he was frightened and ran out the front door. He denied holding a gun to the victim's head or stating that he "ought to finish [his] ass."

The defendant acknowledged that he had a prior conviction for being a felon in possession of a handgun but claimed that he did not carry a gun and did not have a gun with him on the day of the offense. He denied shooting the victim.

The defendant was convicted of reckless endangerment with a deadly weapon as a lesser included offense of aggravated assault and was sentenced to six years in confinement.

Analysis

The defendant argues that insufficient evidence was presented for the jury to convict him of felony reckless endangerment. Specifically, he argues that there was insufficient evidence to rebut his claim of self-defense. When an appellant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). This court will not reweigh or reevaluate the evidence or substitute its evidentiary inferences for those reached by the jury. *State v. Carey*, 914 S.W.2d 93,

95 (Tenn. Crim. App. 1995). Furthermore, in a criminal trial, great weight is given to the result reached by the jury. *State v. Johnson*, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995).

Once approved by the trial court, a jury verdict accredits the witnesses presented by the State and resolves all conflicts in favor of the State. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as trier of fact. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Brewer*, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). A jury's guilty verdict removes the presumption of innocence enjoyed by the defendant at trial and raises a presumption of guilt. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant then bears the burden of overcoming this presumption of guilt on appeal. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).

A person is guilty of reckless endangerment who "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). Reckless endangerment committed with a deadly weapon is a Class E felony. T.C.A. § 39-13-103(b).

The evidence at trial established that on October 21, 2006, the defendant shot the victim in the eye, which resulted in the loss of his sight. The victim testified that, while he was in the boarding house, the defendant pushed him and aimed a gun at his head. The victim said that he ducked and then everything went black. He felt like he had water running down his face and "two holes in [his] eyeball." The victim permanently lost sight in both of his eyes as a result of the shooting.

Earsha Humphrey testified that she witnessed an altercation between the defendant and the victim. She heard a gunshot and saw the defendant chasing the victim outside the boarding house. She saw the victim on the ground, bleeding. She testified that the defendant stood over the victim with a gun to the victim's head and said, "I ought to finish your ass." The defendant then fled the scene.

Both the victim and Humphrey testified that the defendant, rather than the victim, had a gun. The resident manager of the boarding house testified that he had never seen the victim with a gun. The first responding police officer testified that he searched the victim when he arrived and did not find a gun.

Because a jury's guilty verdict removes the presumption of innocence enjoyed by the defendant at trial and raises a presumption of guilt, the defendant then bears the burden of overcoming the presumption of guilt. Here, the defendant has not met his burden. With the exception of his own testimony, all of the evidence presented at trial indicated that the defendant brought the handgun into the boarding house and used it to shoot the victim. The defendant contends that he acted in self-defense, but the jury rejected that contention. Once approved by the trial court,

a jury verdict accredits the witnesses presented by the State and resolves all conflicts in favor of the State. *State v. Williams*, 657 S.W.2d at 410. The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as trier of fact. *State v. Sheffield*, 676 S.W.2d at 547; *State v. Brewer*, 932 S.W.2d at 19. The evidence is sufficient to support the jury's finding.

Next, the defendant contends that the trial court imposed an excessive sentence. Specifically, he contends that the trial court failed to consider any statutory mitigating factors to prevent his sentence from being set at the maximum of six years. An appellate court's review of a challenged sentence is *de novo* on the record with a presumption the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). The Sentencing Commission Comments to this section of the statute indicate the defendant bears the burden of establishing that the sentence is improper. This court may not disturb the sentence when the trial court follows the statutory sentencing procedure and gives due consideration and proper weight to the factors and principles relevant to sentencing. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Our legislature amended the Sentencing Act in 2005, after the United States Supreme Court issued its opinion in *Blakely v. Washington*, 542 U.S. 296 (2004). In *Blakely*, the court decided that "[i]f the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." *Cunningham v. California*, 549 U.S. 270 (2007) (citing *Blakely*, 542 U.S. at 305 & n.8). In order to avoid the constitutional violation arising from a trial court increasing a presumptive sentence on the basis of judicially-determined enhancement factors, the General Assembly revised Tennessee Code Annotated section 40-55-210 to provide as follows: "(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender." *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [sections] 40-35-113 and 40-35-114.

T. C. A. § 40-35-210(c) (2006).

The amended statute no longer imposes a presumptive sentence. Rather, the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." T.C.A. § 40-35-210(d). Those purposes

and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," *id*. § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," *id*. § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," *id*. § 40-35-103(5). In sentencing a defendant, the trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [sections] 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

*Id*. § 40-35-210(b).

The defendant or the State may appeal a trial court's sentencing decision. *Id*. §§ 40-35-401, -402 (2006). The burden of demonstrating that a sentence is erroneous is on the appealing party. *Id*., Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Significantly, the 2005 amendments deleted as grounds for appeal a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. Rather, a defendant may now appeal on the basis, among others, that the sentence "is excessive under the sentencing considerations set out in [sections] 40-35-102 and 40-35-210," *id*. § 40-35-401(b)(2) (2006), and the State may now appeal on the added basis, among others, that the sentence "is inconsistent with the purposes or considerations of sentencing set out in [sections] 40-35-102 and 40-35-103," *id.* § 40-35-402(b)(7). *Carter*, 254 S.W.3d at 344.

In this case, the defendant was convicted of reckless endangerment with a deadly weapon, a Class E felony. *See* T.C.A. § 39-13-103(b) (2006). The trial court imposed the maximum sentence in the applicable range: six years. The defendant had five prior felony convictions, making him a Range III, persistent offender. A Range III offender convicted of a Class E felony is subject to a sentence between four and six years. *Id.* § 40-35-112 (2006). The defendant was sentenced to six years after the trial court applied the following enhancement factor: that he had a previous history of convictions including assault, disorderly conduct, simple possession of drugs, various driving offenses, theft, evading arrest, and unlawful possession of a weapon and that he admitted he had a history of selling drugs. Our review reflects that it was within the trial court's discretion to set the defendant's sentence at six years and that the defendant has not met his burden on appeal of demonstrating that the sentence is excessive. Therefore, we affirm his sentence.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE